**Karen KENNEDY, Plaintiff,**

v.

**LOS ANGELES POLICE DEPART- MENT, City of Los Angeles, Daryl Gates, James J. King, Stanley A. Schott, Mary Buelna, and Karen Houghton, Defendants.**

**No. CV 83–7050–SVW.**

United States District Court, C.D. California.

Aug. 14, 1987.

Pam Lawson, Las Vegas, Nev., for plaintiff.

James K. Hahn, City Atty., Greg Wolff, Deputy City Atty., Los Angeles, Cal., for defendants.

## AMENDED MEMORANDUM AND ORDER

WILSON, District Judge.

In this opinion, the court discusses the constitutionality of a policy of the Los Angeles Police Department ("LAPD") that mandates a visual body cavity search for every pretrial detainee arrested on any felony charge.[1] This issue arises in the following context: the plaintiff, Karen Kennedy, was arrested for grand theft and subjected to a body cavity search. The plaintiff sued for a violation of her civil rights. At trial, a jury found that the plaintiff had been arrested without probable cause and that the body cavity search violated her constitutional rights. The defendants now move for a new trial on the principal ground that the jury was improperly instructed regarding the law on when police officers may conduct body cavity searches of felony arrestees. Because the court finds that the visual body cavity policy at issue here is unconstitutional, it denies the defendants' new trial motion.

## FACTUAL BACKGROUND

This case arises out of the arrest and eventual body cavity search of the plaintiff, Karen Kennedy. The arrest was the result of a dispute between Kennedy and her former roommate who shared a two bedroom apartment in the Brentwood area of Los Angeles. Kennedy and her roommate suffered a falling out after the roommate, without warning, told Kennedy that she was moving out of the apartment leaving Kennedy with a rent she couldn't afford. Kennedy alleged that the roommate owed her money (approximately $600) for apartment and refrigerator rent and telephone bills. When the roommate refused to pay the debt before departing, Kennedy, in a pique of anger, engaged in some self-help by hiding her roommate's portable television and some other minor items in various spots in the apartment as security until the debt was paid. The roommate called the police upon discovering during the process of moving that she could not locate some of her belongings. The police responded by demanding entry into the apartment and ordered Kennedy to remain on a sofa while they searched the entire apartment for the roommate's belongings. The police had Kennedy under continuous observation, even to the point of insisting that she leave the bathroom door open in her apartment when she had a bowel movement. The jury in this case found that the search of the apartment was proper.

After searching for but not finding the television or other items, the officers who had been called to the scene, Officers King and Schott, arrested Kennedy for the felony of Grand Theft. *Grand Theft* is defined in part as the theft of personal property valued at over $400. *See* Cal.Penal Code § 487(1) (West Supp.1986). The testimony at trial revealed hostility and frustration on the part of the officers in not locating the roommate's items and in Kennedy's failure to cooperate by telling the police where she had placed them. No serious effort was made to determine whether or not the miss-

---

1. By contrast, the policy of the Los Angeles Police Department with respect to persons detained on misdemeanor charges is that the Department will only engage in body cavity searches of those arrestees if the Department suspects those arrestees of harboring weapons or contraband.

ing items had a aggregate value of over $400. The jury found that probable cause did not exist for this arrest.

Following her arrest, Kennedy was booked into the Van Nuys jail. During the booking process, she was subjected to a body cavity search.[2] The jury found that

2. In her testimony, Kennedy described the cell to which she was taken:

[Kennedy]: THEY JUST TOOK ME ARM–IN–ARM AND TOOK ME TO THIS PADDED CELL. I RECALL IT BEING LIKE A PADDED CELL WITH A VERY BRIGHT LIGHT AND A DRAIN IN THE CENTER, AND IT WAS JUST A VERY STENCH, SMELLY PLACE.

Under questioning from her attorney, Mr. Lawson, Kennedy also described to which she was subjected in her testimony:

[Kennedy]: ONE OF THE LADIES CAME INTO THE CELL WITH ME AND SHE STARTED TO RUN HER FINGERS THROUGH MY HAIR. AND I WAS ASKING HER WHY SHE WAS DOING THAT, AND SHE WAS TELLING ME THAT SHE WAS CHECKING ME FOR FLEAS AND FOR LICE.

AND SHE HAD ALSO ASKED ME IF I HAD ANY VENEREAL DISEASE, AND I TOLD HER NO. AND SHE SAID, WELL, WHAT WE WANT YOU TO DO IS TO TAKE EACH ARTICLE OF CLOTHING OFF AND TURN IT INSIDE OUT AND THEN GIVE IT TO US. SO I—I—

[Lawson]: EXCUSE ME. DO YOU KNOW THE IDENTITY OF THIS OFFICER, THE WOMAN WHO TOLD YOU THAT? WAS THAT MARY BUELNA?

[Kennedy]: I—I—THE NAME SOUNDS—YES, IT SOUNDS—

[Lawson]: BUT THERE WERE TWO LADIES?

[Kennedy]: BUT THERE WERE TWO. THERE WERE TWO.

[Lawson]: HOW WERE THEY DRESSED?

[Kennedy]: IN UNIFORM.

[Lawson]: FULL UNIFORM—BADGES, EVERYTHING?

[Kennedy]: I DON'T RECALL. I JUST REMEMBER THEY WORE UNIFORMS.

[Lawson]: THAT WAS IT? JUST THE TWO OFFICERS AND YOU, NO ONE ELSE—

[Kennedy]: Yes.

[Lawson]:—IS THAT RIGHT?

ALL RIGHT. NOW, WHAT HAPPENED, THEN, AFTER THEY—THEY TOLD YOUR THEY WANTED YOU TO TAKE OFF EACH ITEM OF YOUR CLOTHING?

[Kennedy]: I KEPT ASKING WHY I HAD TO DO THAT AND WHAT THEY WERE LOOKING FOR, AND THEY JUST TOLD ME THAT I SHOULD JUST FOLLOW THE PROCEDURE AND DO AS THEY SAY.

SO I—AFTER I HAD GOTTEN ALL OF MY CLOTHES OFF, THEY TOLD ME TO TURN AROUND AND—NO, FIRST OF ALL, THEY TOLD ME TO BEND DOWN AND TOUCH THE FLOOR AND TO DO LIKE THESE HOPS LIKE—LIKE A—A—HOPS LIKE A RABBIT WOULD HOP. AND I TOLD—

[Lawson]: WHILE YOU WERE BENT DOWN?

[Kennedy]: YES.

AND I TOLD THEM THAT I COULDN'T BEND DOWN, THAT I HAD A LOT OF PROBLEMS WITH MY BACK. AND THEY JUST TOLD ME, THEY SAID, LOOK, YOU'RE GOING TO THE—YOU'RE GOING TO DO WHAT WE'RE TELLING YOU TO DO. SO, YOU KNOW, I—I WAS SCARED AND I DID WHAT THEY TOLD ME TO DO.

THEN THEY TOLD ME TO BEND DOWN AND TO SQUAT MY—OPEN MY LEGS APART AS FAR AS I COULD, TO STICK MY FINGERS UP MY VAGINA, AND TO PROBE UP THERE TO, UMH, I WAS—I DIDN'T KNOW WHAT FOR.

[Lawson]: WHO WAS IT THAT TOLD YOU TO DO THAT, KAREN?

[Kennedy]: I DON'T KNOW WHICH ONE IT WAS.

[Lawson]: WAS ONE OF THE OFFICERS DOING MOST OF THE TALKING?

[Kennedy]: YES.

[Lawson]: WHAT WAS THE OFFICER DOING, THE OTHER OFFICER, AT THE TIME?

[Kennedy]: JUST STANDING AND OBSERVING AND TELLING ME JUST TO DO AS THEY SAID. AND—

[Lawson]: WERE THERE ANY COMMENTS MADE ABOUT YOUR BODY?

[Kennedy]: JUST AS I TURNED AROUND AND STOOD UP, THEN THIS ONE—I MEAN, HERE I AM, HYSTERICAL, AND THIS LADY COMMENTS ABOUT THE BEAUTIFUL BREASTS I HAD. AND I JUST COULDN'T BELIEVE—(WITNESS CRYING.)

UMH, SO, ANYWAY, THEY TOLD ME TO TURN AROUND AND TO STICK MY BUTTOCKS IN THE AIR AND TO STICK MY FINGERS UP MY ANUS AND TO PROBE AROUND IN THERE FOR THEM TO SEE IF ANYTHING WAS VISIBLE.

AND IT WAS REALLY HUMILIATING, ESPECIALLY WHEN YOU DON'T KNOW WHAT YOU'RE THERE FOR, WHY YOU HAD TO BE PUT THROUGH THIS IN ADDITION.

[Lawson]: KAREN, DO YOU KNOW WHAT TIME IT WAS, ABOUT, THIS—ABOUT THAT TIME THAT ALL THAT WAS HAPPENING TO YOU?

[Kennedy]: I JUST KNOW THAT I WAS IN—IN JAIL FOR ABOUT 11 HOURS.

[Lawson]: DID THEY ASK YOU TO DO ANYTHING ELSE WHEN YOU WERE IN THAT NUDE CONDITION?

[Kennedy]: THEY ASKED ME TO—TO TOUCH THE FLOOR. WHEN I TOLD THEM THAT I COULDN'T TOUCH THE FLOOR

this search was improper because it was conducted even though the jail officials did not have a reasonable suspicion that she was carrying or concealing contraband or a weapon or that she was suffering from a communicable disease.

## DISCUSSION

### I. THE CONSTITUTIONALITY OF THE LAPD POLICY

The first ground of the defendants' motion for new trial ultimately depends on whether the court believes that the LAPD's policy requiring body cavity searches of all felony arrestees is unconstitutional. Below, then, the court explains why the policy is unconstitutional before it addresses the contentions of each side's motion.

■ The standard for when a body cavity search of a pretrial detainee may be conducted is far from certain. At a minimum, however, the cases are clear that such searches cannot take place if they are arbitrary and purposeless.

The starting point of any analysis of the law in this area must be *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Bell* addressed the general question of how to evaluate the constitutionality of conditions or restrictions placed upon pretrial detainees and the specific question of whether body cavity searches of pretrial detainees may ever be conducted on less than probable cause.

In *Bell,* Justice Rehnquist concluded that body cavity searches of pretrial detainees *could* be conducted on less than probable cause. 441 U.S. at 560, 99 S.Ct. at 1885, 60 L.Ed.2d at 482. That holding left open the question, however, of precisely when such searches become unconstitutional. Thus, a court must look to the general language in the opinion in order to derive the standard. First, the court notes that Justice Rehnquist conceded that in this area, the Fourth Amendment does protect both pretrial detainees and convicted prisoners from unreasonable searches. 441 U.S. at 558–59, 99 S.Ct. at 1884, 60 L.Ed.2d at 481. He added that when evaluating whether a particular intrusion is allowable, a court should consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481. This test thus becomes a standard by which the LAPD's policy regarding body cavity searches can be evaluated.

*Bell* is also helpful in determining when searches will clearly be permissible or impermissible. A spectrum of circumstances exists under which a body cavity search might be justified. At one point on the spectrum, represented by the existence of probable cause, a body cavity search is always permissible because *Bell* teaches that such searches of pretrial detainees may be made on less than probable cause. In contrast, at the other end of the spectrum, a search may never take place. This second point is reached when a court determines that the search is merely a restriction or condition that "is arbitrary or purposeless." *Bell,* 441 U.S. at 539, 99 S.Ct. at 1874, 60 L.Ed.2d at 468 ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.").[3]

WITH MY BUTTOCKS IN THE AIR, ONE OF THE POLICEMEN HAD NOTICED THAT I HAD THIS BIG SCAR. AND THEN WHEN SHE NOTICED THAT, THEN THEY SAID, WELL, YOU KNOW, YOU DON'T HAVE TO DO ANY MORE. SO—

**3.** This minimal standard of decency derives from the due process clauses of the fifth and fourteenth amendments and not the eighth amendment. *See Bell,* 441 U.S. at 535 n. 16, 99 S.Ct. at 1872, 60 L.Ed.2d at 466.

The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be cruel and unusual under the Eighth Amendment. The Court recognized this distinction in *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977).

In determining where to draw the line between permissible and impermissible searches, the court is cognizant of *Bell*'s admonition that the courts should not unnecessarily interfere with the management of jails.

Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry.

*Bell*, 441 U.S. at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 473. *See also Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). *Block* stresses that when a District Court reviews the practices of jail officials, it should not substitute "its view on the proper administration of [a jail] for that of … experienced administrators of that facility." *Block*, 468 U.S. at 589, 104 S.Ct. at 3234, 82 L.Ed.2d at 449.

With *Bell* to guide them, the lower courts have tried to define precisely when a body cavity search of an arrestee would be permissible. One area of contention has been whether jail officials are allowed to have a policy requiring strip or even body cavity searches of all arrestees. Knowing that *Bell* allows body cavity searches on less than probable cause, the courts have held that jail officials may not have a blanket policy that they will conduct body cavity searches of *all* arrestees for minor offenses. Rather, the courts have said that such searches may not take place unless the jailers have some "reasonable suspicion." For example, the Ninth Circuit in

*Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) held that an arrestee on a minor traffic offense may not be subjected to a strip search (a less intrusive search than a visual body cavity search) upon being booked into a jail without *reasonable suspicion* that the particular arrestee was carrying contraband or in any way threatening jail security. The blanket policy of the jailer in *Giles* requiring that *all* persons booked into that jail be strip searched regardless of any suspicion that the arrestee threaten jail security was held unconstitutional.

In *Ward v. County of San Diego*, 783 F.2d 1385 (9th Cir.1986) the court reaffirmed its holding in *Giles*. In *Ward*, the blanket policy of the jailer went even further than in *Giles* since the arrestee, who was arrested on a misdemeanor charge, was required to submit to a strip search that included a visual body cavity inspection.

In *Weber v. Dell*, 804 F.2d 796, 802 (2nd Cir.1986), the court held "that the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." [4]

---

**4.** The Second Circuit pointed out in *Weber* that this result was not inconsistent with *Bell*.

In the portion of *Bell v. Wolfish* that applies directly to the issue before us, the Supreme Court held that probable cause is not necessary to justify routine strip/body cavity searches of arraigned pre-trial detainees after those inmates have had contact with visitors from outside the institution. Instead, the "test of reasonableness" requires a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.*, 441 U.S. at 559, 99 S.Ct. at 1884. In the *Wolfish* setting, that test required the balancing of the institution against the privacy interests of "the significant and legitimate security interests of the inmates." *Id.* at 560, 99 S.Ct. at 1885. In concluding that the security interests of the prison in undertaking strip/body cavity searches after "contact" vis-

its outweighed the privacy interests of the inmates—prisoners who had already been arraigned, had failed to make bail, and had presumably chosen to receive visitors and to enjoy physical contact with them—the Court recognized the need for "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546, 99 S.Ct. at 1878 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)). It did not, however, read out of the Constitution the provision of general application that a search be justified as reasonable under the circumstances. The imposition of a standard short of probable cause in determining the balance of interests at stake in *Wolfish* in no way dispensed with that requirement.

*Id.* at 802. Other circuits have come down with similar holdings. *Id.* at 801 n. 6.[5]

■ Unlike the cases cited above, however, this case presents a unique fact pattern in that the plaintiff here was subjected to a body cavity search pursuant to a blanket policy of the LAPD requiring body cavity searches of all felony arrestees even if the jailers have no reason to suspect that an arrestee is harboring weapons or contraband. All but one of the previous cases were limited to blanket policies regarding searches of arrestees for minor offenses.[6] The question for the court is whether the Fourth (and perhaps Fifth) Amendment requires LAPD jailers to have reasonable suspicion before they may conduct a body cavity search of felony arrestees. The court concludes that they must.

The starting point for analyzing this question must be *Bell*, which, as stated above, dictates that in analyzing the reasonableness of any policy regarding searches, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, *the justification for initiating it*, and the place in which it is conducted [cases]." *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481 (emphasis added). There can be no doubt that body cavity searches are one of the most intrusive searches that law enforcement officials can carry out, even if they are conducted in private and in a courteous and professional manner. *See Bell*, 441 U.S. at 558, 99 S.Ct. at 1884, 60 L.Ed.2d at 480 ("Admittedly, this practice instinctively gives us the most pause."). *See also* 441 U.S. at 576–77, 99 S.Ct. at 1893, 60 L.Ed.2d at 492 (Marshall, J., dissenting) ("In my view the body-cavity searches [required in *Bell*] represent one of the most grievous offenses against personal dignity and common decency."). Thus the focus for the court must be the LAPD's justification for initiating this blanket policy with respect to felony arrestees.

The justification for doing such searches was explained in *Bell*.

A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record ... and in other cases.

*Bell*, 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed. at 481.

Thus the justification for such searches is real, but the only test the LAPD uses to determine whether contraband is being harbored by a felony arrestee is the classification of the offense (i.e. felony or misdemeanor).[7] The court does not believe that the classification of an offense alone is sufficiently probative of the question of whether a particular arrestee is harboring contraband. A cursory examination of the California statutes reveals a multitude of felony offenses which do not in any way suggest drugs or dangerous weapons. In California, a felony is "a crime which is punishable with death or by imprisonment in the state prison." Cal.Penal Code § 17 (West Supp.1987). Examples of felonies in this state include willful tax evasion, Cal. Rev. & Tax Code § 19406 (West 1983), securities fraud, Cal.Corp.Code § 25541 (West 1977), conspiracy to restrain trade, Cal.Bus. & Prof.Code § 16755 (West 1987), falsification of accounts by public officials, Penal Code § 424, fraudulently obtaining over $400 in telephone services, Penal Code § 502.7, and bribery of an officer in a financial institution, Penal Code § 639. It is highly unlikely that anyone arrested for these felonies would be harboring weapons

---

5. In this regard, Justice Powell's short opinion in *Bell v. Wolfish*, 441 U.S. at 563, 99 S.Ct. at 1886, 60 L.Ed.2d at 484 concurring in part and dissenting in part states: "In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as reasonable suspicion, should be required to justify the anal and genital searches described in this case."

6. The one case dealing with a felony was *Dufrin v. Spreen*, 712 F.2d 1084 (6th Cir.1983), discussed below.

7. According to its policy, the LAPD may conduct body cavity searches of misdemeanor arrestees if it suspects them of harboring weapons or contraband.

or contraband in body cavities upon arrest. On the other hand, some misdemeanor offenses do involve drugs, violence and weapons. Examples of misdemeanors include assault, Penal Code § 241, disturbing the peace, Penal Code § 415, being under the influence of a controlled substance in public, Penal Code § 647, and carrying a loaded firearm, Penal Code § 12031.

This case provides a prime example of how the LAPD's sole reliance on the fact that an arrestee has been charged with a felony rather than a misdemeanor tells the LAPD almost nothing about whether a suspect is harboring weapons or contraband. At the time Ms. Kennedy was searched, the jailer had, according to the custom and practice of the jail, a booking slip which informed the jailer that Ms. Kennedy was being charged with grand theft—a crime which in almost all instances does not involve weapons or drugs. Further, the jailer testified that she did not have any suspicion that Ms. Kennedy had drugs or weapons.[8] Ms. Kennedy was compelled nonetheless to undergo the visual body cavity search simply because the policy compelled it. If for example the arresting officer decided that the television set and other small items had a value of $399 and not $400, the minimum required for grand theft,[9] Ms. Kennedy would not have been subjected to a visual body cavity search.

Not only does the court believe that the LAPD's search policy with respect to felony arrestees cannot be justified on the basis of its probative value, it also does not believe that the policy can be justified on the basis of administrative necessity. The court notes the jailers are instructed to perform body cavity searches of arrestees charged with misdemeanors only when those arrestees are suspected of harboring weapons or contraband. Furthermore, it appears that the number of arrests for misdemeanors in the City of Los Angeles far outweighs the number of felony arrests here.[10] Thus the jailers have shown themselves capable of making these determinations, and the record shows that they do in fact make such determinations with respect to a substantial percentage of the individuals arrested in the City of Los Angeles.

Because a felony charge alone tells a jailer almost nothing about whether an arrestee is harboring weapons, money, drugs, or other contraband, the court believes that the LAPD's policy requiring body cavity searches of all felony arrestees amounts to punishment of these individuals. As *Bell* points out, a restriction or condition upon an arrestee in a jail which is not "reasonably related to a legitimate goal," but is rather "arbitrary or purposeless" is punishment and prohibited by the fifth and fourteenth amendments. *See Bell*, 441 U.S. 535–39, 99 S.Ct. at 1874, 60 L.Ed.2d 468. Thus the court believes that even under the broad guidelines set forth by *Bell*, this policy of the LAPD cannot pass constitutional muster.

The court has found only one opinion that arguably appears to draw a conclusion different from its own. *See Dufrin v. Spreen*, 712 F.2d 1084 (6th Cir.1983). In *Dufrin*, the court considered a fourth amendment challenge to a search that took place under a policy of a jailer that re-

---

**8.** Evidently, even the arresting officers themselves had no suspicion that Ms. Kennedy was carrying drugs or weapons for they did not bother to search her. *See Tinetti v. Wittke*, 479 F.Supp. 486 (E.D.Wis.), *aff'd*, 620 F.2d 160 (7th Cir.1980).

In fact, there was hardly a need since she was arrested at her apartment and the officers watched her every movement thereafter—even to the point of watching her go to the bathroom and have a bowel movement. Because she was under the control of the police officers at all times thereafter for alleged "security reasons," the examination of her anus at the jail was even more senseless. *See Jones v. Edwards*, 770 F.2d 739, 740–41 (8th Cir.1985).

**9.** The evidence at trial demonstrated that the officers merely made an educated guess at best as to their worth.

**10.** The court notes that in 1985, the total number of felony arrests in the city of Los Angeles was 61,282. The number of women arrested for felonies was 6,501. In contrast, the total number of misdemeanor arrests is 99,614, and number women arrested for misdemeanors was 17,079. California Department of Justice, Division of Law Enforcement, Bureau of Criminal Statistics and Special Services, *1985 Criminal Justice* (Los Angeles County).

quired a strip search for *all* female arrestees "regardless of the nature of the charges against them and regardless of the probability that they might be carrying contraband." The court in that case, however, did not actually pass upon the policy itself. 712 F.2d at 1089 ("Since this is a purely individual claim under § 1983, we are not asked ... to make any rules of broad application or to lay down any bright line based upon the type of crime charged."). The court then went on to uphold that search, stressing that the felony involved there is one of violence.

Given the scope of what was decided in *Dufrin*, it is only fair to compare the two cases on their facts, and several significant facts distinguish *Dufrin* from the case at bar. First, the offense in *Dufrin* was felonious assault, which the *Dufrin* court itself observed has violence as an element. Second, the matron was not made aware of the specific charges against the prisoners committed to her custody. In the case at bar, the crime charged did not suggest contraband or drugs and the matron as a matter of routine, was made aware of the crime for which the arrestee was booked. It is clear that the *Dufrin* court placed great weight on the nature of the offense and noted that the other strip search cases involved misdemeanor and minor offenses not normally associated with weapons or contraband.

Thus this court concludes that the policy of the LAPD requiring body cavity searches of all felony arrestees is unconstitutional because it is arbitrary and purposeless. Therefore, the court believes that it correctly instructed the jury on the question of whether the search that took place in this case was proper. The instruction of the court was as follows:

> [T]he jail officials must have had reasonable suspicion that she was carrying or concealing contraband or a weapon or that she was suffering from a communicable disease. Factors for you to consider in determining whether the jail officials had reasonable suspicion include the

nature of the alleged offense, Ms. Kennedy's appearance and conduct at the time, whether she had a prior record and any other information the police had at the time she was booked.

Note that this instruction includes the nature of the offense as an element that a jailer may consider in determining whether to conduct a search. The problem with the LAPD policy is it only depends on whether a felony has been charged. Because the instruction comports with the requirements of *Bell* and its progeny, the court rejects the defendants' argument that the instruction was incorrect and denies its new trial motion.

In denying this new trial motion, the court is expressing the view that the fourth and fourteenth amendments require prison officials to determine under a minimal standard of reasonable suspicion whether a felony arrestee is carrying contraband or a weapon before conducting a body cavity search. The court stresses that it is not this court's purpose to superimpose its views of prison administration upon those professionals entrusted with the safety of our prisons. We are not telling the prison officials how to perform this task or what factors they should consider in evaluating reasonable suspicion. The factors listed in the jury instruction only provided suggestions to assist them in their task. The LAPD may, for example, find that the nature of the crime charged alone without more might suffice.[11] The court does conclude, however, that some determination of reasonable suspicion is required for persons initially booked on felonies as well as those booked on misdemeanors.

## II. QUESTIONING OF WITNESSES

■ A second ground upon which defendants found their new trial motion involves the alleged abuse of discretion by the court in questioning the defendant officers while they were testifying. This ground does not require a new trial. The

---

**11.** We do not suggest that this is the only means of evaluation or that the description of the crime itself is the *sine qua non* for conducting

the search. *See Clements v. Logan,* 454 U.S. 1304, 1310, 102 S.Ct. 284, 288, 70 L.Ed.2d 461, 466 (1981).

court may question witnesses on the stand. *See, e.g., United States v. Articles of Device,* 481 F.2d 434 (10th Cir.1973); *Beetler v. Sales Affiliates, Inc.,* 431 F.2d 651 (7th Cir.1970). Furthermore, the court notes that it cautioned the jury that any questions asked by the court were not to be construed as indicating that the court had any opinion regarding the issues at hand.

IT IS SO ORDERED.