**Karen KENNEDY, Plaintiff–Appellee,**

v.

**LOS ANGELES POLICE DEPART-MENT; City of Los Angeles; James J. King; Stanley A. Schott, Defendants–Appellants.**

Nos. 87–6316, 87–6400, and 87–6602.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1988.

Decided Oct. 11, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc April 9, 1990.

Richard M. Helgeson, Asst. City Atty., Los Angeles, Cal., for defendants-appellants.

Joan W. Howarth and Pamela R. Lawson, ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiff-appellee.

Before HALL and LEAVY, Circuit Judges, and GEORGE *, District Judge.

* Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

## ORDER

The opinion published in 887 F.2d 920 shall be amended at page 934 as follows:

> Grand theft, a felony, thus properly could be considered in deciding whether to search Kennedy. And in some cases, the charge itself may give rise to reasonable suspicion. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir.1989) (The felony of grand theft auto "is sufficiently associated with violence to justify a visual strip search.") (footnote omitted); ....

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed.R.App.P. 35.)

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Karen Kennedy brought a civil rights action under section 1983 against, among others, the Los Angeles Police Department and two of its officers, James J. King and Stanley A. Schott. The case reached the jury, who after determining that Kennedy's rights were violated, awarded her compensatory and punitive damages.

### I

Karen Kennedy and Karen Houghton were roommates in a two-bedroom apartment. The two women had entered into a two-year lease on November 15, 1982. On January 21, 1983, Houghton, without prior warning, left Kennedy a note indicating that she would be vacating the apartment the following morning. According to Kennedy, Houghton owed her a total of $694 for her portion of rent and utilities and for bounced checks.

The following morning Houghton, with her parents and grandparents, arrived at the apartment with a car trailer to retrieve her belongings. Kennedy testified that she unsuccessfully attempted to speak with Houghton about their differences. Houghton refused to pay the debt before departing and told Kennedy that she was moving to La Jolla, California (although in fact she was moving to Beverly Hills). Houghton left no forwarding address.

Houghton made several trips to complete her move. During one of the trips, Kennedy moved two of Houghton's wicker chairs into Kennedy's bedroom and Houghton's television into the living room behind some drapes. Kennedy retained these items as "security" for the debt Houghton owed her. Kennedy then installed a lockout device on the front door to prevent Houghton from entering the apartment with her key. When Houghton returned, she noticed that some of her belongings were missing. She called the police.

Officers King and Schott responded to the call. They demanded entry into the apartment. Kennedy was with her daughter and a friend of her daughter. The officers then spoke with Kennedy, who explained that she intended to hold the property as security for money Houghton owed her. The officers ordered Kennedy to remain on the sofa while they searched the apartment for the missing items.[1] The officers' search was unsuccessful.

Officers King and Schott arrested Kennedy for grand theft, a felony, and escorted her to the Van Nuys jail. At the jail, Kennedy was forced to submit to a body-cavity search. After stripping off all her clothing, Kennedy was required to expose her vaginal and anal cavities so that the two women officers could determine whether Kennedy was concealing drugs or weapons. She was not.

In a special verdict, the jury determined that King and Schott were not entitled to qualified immunity and had violated Kennedy's constitutional rights when they arrested her. The jury awarded $5,000 in actual damages against each officer, as well as $3,000 in punitive damages against King and $1,000 in punitive damages against

---

1. The jury found that the search of the apartment was lawful.

Schott. The jury also determined that Kennedy's constitutional rights were violated because of the City of Los Angeles' policy to subject all those arrested for felonies to a body-cavity search. The jury awarded $25,000 in actual damages against the City.

Appellants timely appeal from the jury's determination. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(4). This court has jurisdiction under 28 U.S.C. § 1291.

## II

At the end of Kennedy's case, and at the end of trial, appellants moved for a directed verdict. On appeal, the officers contend that the district court erred in failing to direct a verdict in their favor. They advance two bases to support this contention: (1) that probable cause to arrest was established as a matter of law; and (2) that they were entitled to qualified immunity as a matter of law.

## A

For Kennedy to prevail under her section 1983 claim, she must establish that (1) she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by state action. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Gorenc v. Salt River Project Agric. Improvement and Power Dist.,* 869 F.2d 503, 505 (9th Cir.1989). The appellants contend that the district court erred in denying their motions for a directed verdict on the ground that probable cause to arrest was established as a matter of law. Appellants thus conclude that the arrest did not violate the Constitution.

"A directed verdict ... should not be granted unless 'the evidence permits only one reasonable conclusion as to the verdict.' The evidence must be viewed in the light most favorable to the prevailing party and all inferences must be drawn in that party's favor." *Flores v. Pierce,* 617 F.2d 1386, 1389 (9th Cir.) (quoting *Kay v. Cessna Aircraft Co.,* 548 F.2d 1370, 1372 (9th Cir.1977)), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). In a sec-

tion 1983 action, probable cause generally is a jury question. *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984). However, a directed verdict on the issue of probable cause is proper if no reasonable jury could determine that the officers did not have probable cause to arrest. *Id.* " 'Probable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution and prudence in the belief that the defendant is committing or has committed a crime.' " *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985) (quoting *State v. Lemire,* 121 N.H. 1, 424 A.2d 1135, 1138 (1981)).

The officers arrested Kennedy for committing grand theft, a violation of California Penal Code § 487. Under California law, theft is defined in the following manner: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another ... is guilty of theft." Cal.Penal Code § 484(a) (West 1988). Grand theft occurs "[w]hen the money, labor or real or personal property taken is of a value exceeding four hundred dollars ($400)...." *Id.* at § 487.

The district court recognized, and the appellants do not contest, that an element of the crime of grand theft is the specific intent permanently to deprive an owner of her property. *See People v. Kageler,* 32 Cal.App.3d 738, 745; 108 Cal.Rptr. 235, 239 (1973). The court instructed the jury that if it determined that the officers reasonably should have known that Kennedy "merely intended to take temporary possession of the property belonging to Houghton, for example, as security for a debt owed by Houghton," they did not have probable cause. Appellants do not challenge this instruction. Part of the probable cause analysis must be whether the officers could believe that Kennedy had the necessary intent.

As part of the investigation, Schott discovered from Houghton that Kennedy had told Houghton that she was keeping her property as security until Houghton paid

Kennedy the money she was owed. Schott admitted that he "probably" passed this information on to King when King arrived at the scene. And when King and Schott confronted Kennedy in her apartment, Kennedy and a friend of her daughter explained to the officers that Kennedy was holding the property as security until Houghton paid her debts.

■ Upon reviewing the facts in this case, giving Kennedy the benefit of all reasonable inferences that may be drawn from the evidence presented at trial, we conclude that there was sufficient evidence to support the jury's determination that probable cause for an arrest was lacking. The officers do not contend on appeal (nor would the record support) that they believed Kennedy was holding Houghton's property for any purpose other than as security for a debt allegedly owed. Therefore, there was no reasonable basis from which anyone could believe that Kennedy had the specific intent permanently to deprive Houghton of her property. On the contrary, the jury quite properly concluded that a prudent person would not have believed that Kennedy, who was entangled in an ordinary neighborhood dispute, had committed grand theft. *See United States v. Hoyos*, 868 F.2d 1131, 1136 (9th Cir. 1989). Consequently, the district court properly refused to direct a verdict for the appellants.

### B

■ The appellants next contend that the district court erred in refusing to grant a directed verdict on the ground of qualified immunity. Police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It is clearly established, of course, that an arrest without probable cause violates the Constitution. *See McKenzie*, 738 F.2d at 1007. Thus, the relevant question in this case is "whether a

reasonable officer could have believed [Kennedy's warrantless arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *see Kraus v. County of Pierce*, 793 F.2d 1105, 1109 (9th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *see also Floyd*, 765 F.2d at 5; *Bilbrey v. Brown*, 738 F.2d 1462, 1466–67 (9th Cir.1984). This court has stated that this inquiry is a question for the trier of fact. *Schlegel v. Bebout*, 841 F.2d 937, 945 (9th Cir.1988). However, if there is only one reasonable conclusion a jury could reach on this issue, a directed verdict would have been proper. *Cf. Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040 (qualified immunity issue can be argued as a matter of law on summary judgment).

Our preceding discussion about the obvious lack of probable cause is dispositive of the qualified immunity question. The jury could have concluded that no reasonable officer in Schott's and King's position could have believed that Kennedy had the requisite criminal intent necessary to give rise to probable cause to arrest her for grand theft. The only information the officers had about Kennedy's intent in taking Houghton's property was that Kennedy was holding it as security. The officers heard this explanation from Houghton, Kennedy, and a friend of Kennedy's daughter. There simply was no evidence to indicate any other intent. Accordingly, the district court did not err in denying the appellants' motions for a directed verdict on qualified immunity.

### III

Appellants claim that the district court improperly instructed the jury on probable cause. Specifically, they contend that the jury instructions improperly intertwined the standard for probable cause with the concept of sufficient evidence to prove guilt.[2]

---

**2.** The appellee urges us not to address the merits of this issue, arguing that this objection was

This court reviews instructions to determine, viewing them as a whole, whether they adequately cover each issue and whether they are misleading or state the law incorrectly. *Martinelli v. City of Beaumont*, 820 F.2d 1491, 1493 (9th Cir. 1987). In the contested instruction, the court told the jury in part:

> A police officer may not arrest a person for the commission of a felony without an arrest warrant unless he has probable cause to believe that a felony has been committed by the person arrested whether or not a felony has in fact been committed. Probable cause exists if the facts and circumstances known to the officer, and of which he had reasonable trustworthy information, are sufficient to warrant a prudent person in believing that the suspect has committed a felony. The hunch, guess, conjecture or surmise of an officer is not enough, and there must be enough actual evidence to reasonably lead to the conclusion that the suspect has committed a felony.
>
> In the present case, to constitute "probable cause" for the arrest of plaintiff for the commission of GRAND THEFT, without an arrest warrant, the evidence must establish that defendant officers KING and SCHOTT must have had reasonable cause to believe ALL of the following:
>
> 1. That plaintiff stole, took or carried away the personal property of defendant HOUGHTON; AND
>
> 2. That plaintiff had the specific intent to PERMANENTLY DEPRIVE defendant HOUGHTON of her property; AND

> 3. That the property had to have a reasonable and fair market value of more that [sic] $400.00 at the time of the theft and the locality of the theft....

Appellants suggest that this instruction improperly "mandates a determination by the officers of plaintiff's *guilt* of theft rather than the *probability* of criminal activity." This argument is meritless. The instruction properly stated that probable cause exists if there were sufficient facts "to warrant a prudent person in believing that the suspect has committed a felony." This is in accord with the law. *See Floyd*, 765 F.2d at 5. The court never suggested that the "reasonable cause" necessary for arrest was the same as the "proof beyond a reasonable doubt" needed for a criminal conviction.

## IV

Appellants contend that the evidence was insufficient to support the jury's award of punitive damages: $3,000 against King and $1,000 against Schott. We disagree.

 Punitive damages may be assessed in section 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The decision to impose such sanctions is within the exclusive province of the jury. *Runge v. Lee*, 441 F.2d 579, 584 (9th Cir.), *cert. denied*, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971).[3]

not raised at trial. However, the appellants sufficiently preserved this objection. They objected to the instruction in general and proposed an alternate instruction on probable cause. Moreover, the court was aware that the appellants did not agree with the instructions. *Martinelli v. City of Beaumont*, 820 F.2d 1491, 1493 (9th Cir.1987).

**3.** Appellants urge us to adopt a stringent standard for reviewing a jury's award of punitive damage—substantial evidence beyond a reasonable doubt. The appellants acknowledge that Ninth Circuit case law does not support this proffered standard. Brief of Appellant at 14.

We reject the appellants' novel standard. Initially, they ignore the well-established principle that we cannot overrule Ninth Circuit precedents without convening en banc. *Christoffel v. E.F. Hutton*, 588 F.2d 665, 667 (9th Cir.1978). Furthermore, the appellants appear to confound the standard the jury must consider in determining whether to impose punitive damages and that which we must employ upon review. The jury's discretion is considerable, *see Kraus v. Santa Fe S. Pac. Corp.*, 878 F.2d 1193, 1200 (9th Cir.1989), and, if supportable, will not be lightly disturbed, *see Fountila v. Carter*, 571 F.2d 487, 492 (9th Cir.1978); *see also Kraus*, 878 F.2d at 1200.

■ Appellants' insufficiency argument is meritless. There is no question that the officers knew that they were responding to a neighborhood dispute. It is also clear that the officers had no reason to believe that Kennedy took Houghton's property for any reason other than as security. Yet they arrested her, even though they were aware of the specific intent requirement of grand theft.[4] Furthermore, although the officers testified that Kennedy's refusal to tell them the location of Houghton's television was a large factor in determining that probable cause existed to arrest, Kennedy testified that the officers repeatedly told her to "shut up" when she tried to explain the situation.

Under all these circumstances, we conclude that the jury could determine that arresting Kennedy constituted reckless disregard for her right not to be arrested without probable cause. *See Gagnon v. Ball,* 696 F.2d 17 (2d Cir.1982) (arresting someone requesting help from police without determining whether her complaint is justified evidences reckless disregard for rights of others). There is ample support in the record to justify the jury's determination.

### V.

■ Appellants also claim that the district court committed reversible error by questioning the police officers in such a way as to create the impression of partiality. In support of their claim, appellants quote the following line of court inquiry concerning the value of the property Kennedy had taken:

The Court: That's what [her roomate [sic]] said—

King: That's correct.

The Court: —Isn't that right? And you never did anything but accept what she said to you; isn't that correct?

King: That's all I could really go on at that time. I mean, I had to make a reasonable decision....

The Court: Do you think you could have waited a few days and inquired further?

King: I had a victim and a father who were insistent.

The Court: So you arrest people because fathers of victims tell you to do so, is that your position?

King: No, sir. We hadn't even gotten to that point....

The Court: You're not a recovery agency, are you?

. . . . .

You're a police department; isn't that right?

. . . . .

Other people worry about recovering property, not you; isn't that right?

King: No, sir. Part of our mission is the recovery of property....

The Court: You could have waited a couple of days, couldn't you have ...?

King: We did look into it further, your honor.

. . . . .

The Court: But you arrested her that day, didn't you?

. . . . .

How much time elapsed between the time you walked into her apartment and the time you placed her under arrest?

King: [Around] 20 to 30 minutes.

Court: So that was the extent of your investigation?

Appellants quote another exchange to demonstrate improper judicial questioning:

The Court: Couldn't you have gone down to the city attorney's office and gotten a complaint [before arresting Kennedy]?

. . . . .

Schott: I would have been remiss in my responsibilities if I did that.

---

**4.** King's testimony shows that he was aware of the "intent permanently to deprive" element of grand theft. And Schott testified that he knew intent is a critical element of grand theft (although he also seemed to believe that taking someone's property for *any* reason constitutes theft).

The Court: That's your view. But could you have done that?

. . . . .

You could have investigated further before making an arrest, though, couldn't you have?

Schott: I'm not quite sure how much further I could have investigated.

The Court: Could you have checked the value of the property?

Schott: That's not normally our procedure....

The Court: In this case you didn't even see the television, did you?

Schott: No....

■ In a federal courtroom, a district judge has the undeniable right to examine witnesses and call the jury's attention to important evidence. *Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525, 531 (9th Cir. 1986). This may be necessary to "clarify[ ] the evidence, control[ ] the orderly presentation of the evidence, confine[ ] counsel to evidentiary rulings, and prevent[ ] undue repetition of testimony." *United States v. Malcolm,* 475 F.2d 420, 427 (9th Cir.1973), *quoted in United States v. Harris,* 501 F.2d 1, 10 (9th Cir.1974). However, attached to this right is an important qualification: the judge must always remain fair and impartial. "[A] trial court must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality." *Harris,* 501 F.2d at 10; *see also Pollard v. Fennell,* 400 F.2d 421, 424 (4th Cir.1968) ("[A]s one who, in the eyes of the jury, occupies a position of preeminence and special persuasiveness, the district judge must be assiduous in performing his function as governor of the trial dispassionately, fairly and impartially."). Indeed, the sensitivity of the judge's role has prompted us, on many occasions, to urge judicial restraint. *See, e.g., Shad,* 799 F.2d at 531 (9th Cir.1986) (quoting *Warner v. Transamerica Ins. Co.,* 739 F.2d 1347, 1351 (8th Cir.1984)); *Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282, 1289 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985); *Harris,* 501 F.2d at 10–11.

■ The standard for reversing a verdict because of general judicial misconduct during trial is rather stringent. *Handgards,* 743 F.2d at 1289. We must determine whether the district court's inquiry rendered the trial unfair. *Id.* This court has stated:

A trial court will be reversed for excessive judicial intervention only if the record "disclose[s] actual bias on the part of the trial judge [or] leave[s] the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality."

*Shad,* 799 F.2d at 531 (quoting *Warner,* 739 F.2d at 1351). And we have noted: "Very few cases outside of the criminal law area support an appellate finding of general judicial misconduct during trial." *Handgards,* 743 F.2d at 1289; *see also In re Aircrash in Bali, Indonesia,* 871 F.2d 812, 815 (9th Cir.1989).

Regrettably, the trial court's questioning was not marked by complete indifference. Some of his questions instead were quite pointed and intemperate. Nevertheless, viewing the trial record as a whole, we conclude that reversal is not warranted. It cannot be said that the court "repeatedly and consistently" was discontent to allow counsel to question witnesses. *See Pollard,* 400 F.2d at 424 (judge impeded counsel's interrogation repeatedly, assumed the role of witness as well as advocate, and misstated factual accounts, requiring reversal). The court's questioning and the responses fill only eight pages of the 400 page transcript. The court did not assume a role as witness by introducing evidence at trial. *See id.* at 425–26. Nor did the court dominate questioning of the witnesses so as to preempt counsel's function. *See Sit-Set, A.G. v. Universal Jet Exchange, Inc.,* 747 F.2d 921, 926 (4th Cir.1984) (finding "judicial domination of the examination of witnesses so persistent [and yet unnecessary] throughout the trial that the result was an effective preemption of counsel's legitimate function in the adversarial process").

The court began questioning King because counsel repeatedly strayed to an area of questioning that the court had disallowed (strip search). The court's questions began as an attempt to get counsel back on track about the value of the television. The court's questioning of Schott was prompted by Schott's statement that he would have been negligent in his duties if he did not arrest Kennedy immediately, to which the court expressed understandable skepticism. *Cf. Pollard*, 400 F.2d at 424–25 (no apparent justification for judicial intervention); *Sit–Set*, 747 F.2d at 926 (same). Questions indicating skepticism are not improper if witnesses are permitted to respond. *Shad*, 799 F.2d at 531. Moreover, the court explained to the jury that the court's questions were not indicative of its feelings about the case. Such a disclaimer is not a panacea for pervasive and biased judicial action. *See Sit–Set*, 747 F.2d at 926. But given the limited scope of the court's intervention in the present case, we believe this explanation alleviated any appearance of impartiality the judge's questioning may have conveyed. *See Shad*, 799 F.2d at 531; *see also United States v. Laurins*, 857 F.2d 529, 538 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989).

## VI

 The Los Angeles Police Department (LAPD) has a policy requiring all those who are arrested on suspicion of having committed a felony to be subjected to a body-cavity search. The jury found that this policy, which resulted in Kennedy being searched, violated her rights. Kennedy was awarded $25,000 in actual damages against the City of Los Angeles.

Appellants challenge the district court's instruction that the body-cavity search of Kennedy would violate her fourth amendment rights unless the jail officials "had a reasonable suspicion that she was carrying or concealing contraband or a weapon or

that she was suffering from a communicable disease."[5] Appellants moved for a new trial, which was denied. The district court issued an opinion holding that the LAPD's policy of conducting a visual body-cavity search of *all* felony arrest detainees, regardless of reasonable suspicion, violates the fourth amendment. *Kennedy v. Los Angeles Police Department*, 667 F.Supp. 697 (C.D. Cal.1987).

This court reviews instructions to determine whether viewing them as a whole, they adequately cover each issue and whether they are misleading or state the law incorrectly. *Martinelli*, 820 F.2d at 1493. This court reviews de novo questions of law. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### A

The City of Los Angeles has imposed a blanket policy that subjects all felony arrestees to a visual body-cavity search. The policy mandates in part:

Arrestees booked into Department facilities on all felony offenses, and misdemeanor offenses related to the use of narcotics, shall be given a skin search. Skin searches of arrestees booked on other misdemeanor charges shall be made when there is probable cause to believe that an arrestee is concealing contraband or weapons.

When there is probable cause to believe that an arrestee is concealing contraband or weapons inside a body cavity, a visual body-cavity search shall be conducted.

Facially, the policy appears to acknowledge the difference in intrusiveness between a skin search and a body-cavity search, requiring probable cause only for the latter. However, the LAPD has eliminated this distinction in its construction and

---

**5.** The court gave further guidance:
 Factors for you to consider in determining whether the jail officials had reasonable suspicion include the nature of the alleged offense, Ms. Kennedy's appearance and conduct at the

time, whether she had a prior record and any other information the police had at the time she was booked.
*Kennedy v. Los Angeles Police Dep't*, 667 F.Supp. 697, 704 (C.D.Cal.1987).

implementation of the policy. A police officer of the City of Los Angeles testified that the body-cavity search was part of a skin or strip search, and so the skin search, strip search, and visual body-cavity search were really "one and the same." The litigants do not take issue with this characterization. Accordingly, for purposes of deciding this case, we must analyze the LAPD's policy as requiring perfunctory body-cavity searches of all felony arrestees.[6] Our ultimate task is to determine whether the searches mandated by this policy are reasonable under the fourth amendment.

### B

The intrusiveness of a body-cavity search cannot be overstated. Strip searches involving the visual exploration of body cavities is dehumanizing and humiliating. The Supreme Court has commented: "Admittedly, this practice instinctively gives us the most pause." *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *see also id.* at 576–77, 99 S.Ct. at 1893–94 ("In my view the body-cavity searches ... represent one of the most grievous offenses against personal dignity and common decency.") (Marshall, J., dissenting). *See generally* Shuldiner, *Visual Rape: A Look at the Dubious Legality of Strip Searches*, 13 J. Marshall L.Rev. 273 (1980).

Kennedy first was forced to strip off all her clothing. After exposing her naked body to two policewomen, Kennedy then was required to insert her fingers into her vagina and anus so that the policewomen could check whether she had concealed any drugs or contraband in these body cavities. In response to her lawyer's questioning, Kennedy described this frightening experience:

Kennedy: One of the ladies came into the cell with me and she started to run her fingers through my hair. And I was asking her why she was doing

that, and she was telling me that she was checking me for fleas and for lice.

. . . . .

Lawyer: Then, after ... they wanted you to take off each item of clothing?

Kennedy: I kept asking why I had to do that and what they were looking for, and they just told me that I should just follow the procedure and do as they say.

So I—after I had gotten all of my clothes off, they told me to turn around and—no, first of all, they told me to bend down and touch the floor and to do like these hops like—like a—a rabbit would hop.

. . . . .

And I told them that I couldn't bend down, that I had a lot of problems with my back. And they just told me, they said, look, you're going to the—you're going to do what we're telling you to do. So, you know, I—I was scared and I did what they told me to do.

Then they told me to bend down and to squat my—open my legs apart as far as I could, to stick my fingers up my vagina, and to probe up there to, umh, I was—I didn't know what for.

. . . . .

Lawyer: Were there any comments made about your body?

Kennedy: Just as I turned around and stood up, then this one—I mean, here I am, hysterical, and this lady comments about the beautiful breasts I had. And I just couldn't believe—(witness crying.)

Umh, so anyway, they told me to turn around and to stick my buttocks in the air and to stick my fingers up my anus and to probe around in there for them to see if anything was visible. And it was really humiliating, especially when you don't know what

6. We, therefore, have no occasion to pass upon the constitutionality of an official policy that subjects all felony arrestees to strip searches that do not involve visual inspection of body cavities. Nor, of course, do we have occasion to assess the constitutionality of a blanket search policy that more narrowly focuses on particular types of felony arrests.

you're there for, why you had to be put through this in addition.

. . . . .

Lawyer: Did they ask you to do anything else when you were in that nude condition?

Kennedy: They asked me to—to touch the floor. When I told them that I couldn't touch the floor with my buttocks in the air, one of the policemen had noticed that I had this big scar. And then when she noticed that, then they said, well, you know, you don't have to do any more. So—

After the search, Kennedy was placed in a cell until, hours later, bond was posted.

It is against this backdrop that we must test the constitutionality of the LAPD's body-cavity search policy. *See Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884.

### C

The Supreme Court has emphasized "the limited role" of courts in the administration of detention facilities. *Block v. Rutherford,* 468 U.S. 576, 584–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984). Corrections officials possess special expertise in this area and must struggle regularly to maintain security in a most difficult and potentially explosive setting. *Id.* (citing *Wolfish,* 441 U.S. at 540–41 n. 23, 99 S.Ct. at 1874–75 n. 23). This sober understanding has led the judiciary to accord special deference to the judgments of administrators concerning the functioning of correctional facilities. *Id.*

Nevertheless, the judiciary does play a significant, albeit limited, role. Convicted prisoners, no less those suspected of having perpetrated criminal activity, retain some constitutional liberties. *Wolfish,* 441 U.S. at 545, 99 S.Ct. at 1877 ("[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), *quoted in Wolfish,* 441 U.S. at 545,

99 S.Ct. at 1877. When litigants petition the federal courts to review the application of an institutional policy, the courts must proceed cautiously; the Supreme Court has sounded this warning emphatically and with considerable wisdom. Yet, at the same time, we must be equally careful not to abdicate our function as the guardians of the Constitution. In the end, there must be a delicate balancing; "[t]here must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.'" *Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877 (quoting *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2974).

### D

In attempting to arrive at a mutual accommodation between the institutional needs and objectives of the LAPD and the shield of the Constitution, we are without a mechanistic formula. Instead, the Supreme Court has cautioned:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884.

We already have addressed the scope of the intrusion of a visual body-cavity search. Kennedy's testimony of her ordeal illustrates all too well the personal invasion this search entails. Next, we examine the manner in which the search was conducted. It does not appear that Kennedy's search was performed abusively. In her brief, Kennedy does make passing reference in her factual statement that an inspecting officer "commented about her breasts," but fails to argue that the search in general was abusive. We then analyze the place in which the search was conducted. Here, the policewomen accompanied Kennedy to a room in the Van Nuys jail, where she was

searched. Kennedy does not complain that the room exposed her to passersby or in any other way made the search more humiliating.

The critical inquiry is whether the LAPD has sufficient justification for imposing its blanket search policy. The LAPD proffers that "[concerns] for safety, security, and the proper administration of the jail system provided the foundation for such a policy" and that "[p]rison officials have a legitimate penological interest in preventing drugs, contraband weapons or other unlawful objects from entering penal facilities." These concerns and this interest no doubt are weighty. As the *Wolfish* Court acknowledged:

A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases.

441 U.S. at 559, 99 S.Ct. at 1884 (citations to the record and to other cases omitted).

Nevertheless, the enacted policy, if it is to be constitutional, must be "reasonably related" to the penal institution's interest in maintaining security. *Id.* at 540, 99 S.Ct. at 1874; *see Watt v. City of Richardson Police Dep't*, 849 F.2d 195, 198 (5th Cir.1988) (upholding a search policy limited to those offenders charged with or having criminal history of narcotics, shoplifting, or weapons charges); *cf. Thornburgh v. Abbott*, —— U.S. ——, 109 S.Ct. 1874, 1879, 104 L.Ed.2d 459 (1989); *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2261–2262, 96 L.Ed.2d 64 (1987). A ham-handed approach to policy making runs the serious risk of infringing upon detainees' constitutional rights. In the instant case, the LAPD fails to offer a serious justification for subjecting all felony arrestees to a body-cavity search as a matter of course, whereas only those misdemeanor arrestees charged with offenses relating to narcotics or suspected of concealing contraband or

weapons are forced to undergo such a search. The LAPD asserts:

It is not unreasonable for the legislature and the City's police department to assume that felony suspects, because of the societal judgment respecting the greater reprehensibility of their crimes, pose a correspondingly more substantial risk of also violating the security concerns of the City's detention facility.

The principle that courts must provide wide latitude to prison policies needed to maintain institutional order and security, *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878, necessarily presupposes that the administrators have crafted those policies with careful deliberation. The LAPD's justification is devoid of any trace of such care; instead, it rests on "assum[ptions]" and "societal judgment[s]." A glaring omission from the LAPD's justification is any documentation (or even assertion) that felony arrestees have attempted to smuggle contraband into the jail in greater frequency than misdemeanor arrestees.

The district court below convincingly demonstrated that the felony/misdemeanor classification is not reasonably related to the institution's objective of maintaining security. It conducted a thoughtful examination of California's criminal scheme to show that a crime's classification as a felony or misdemeanor alone cannot reasonably forecast an arrestee's stealthful proclivities. The district court noted that the following crimes are considered felonies in California: willful tax evasion, Cal.Rev. & Tax Code § 19406 (West 1983), securities fraud, Cal.Corp.Code § 25541 (West 1977), conspiracy to restrain trade, Cal.Bus. & Prof.Code § 16755 (West 1987), falsification of accounts by public officials, Cal.Penal Code § 424, fraudulently obtaining over $400 in telephone services, Cal.Penal Code § 502.7, and bribery of an officer in a financial institution, Cal.Penal Code § 639. *Kennedy*, 667 F.Supp. at 702. The district court contrasted these felonies, which by dint of classification would trigger a routine body-cavity search, with the following crimes that are designated misdemeanors and yet do not automatically actuate such a search: assault, Cal.Penal Code § 241, dis-

turbing the peace, Cal.Penal Code § 415, being under the influence of a controlled substance in public, Cal.Penal Code § 647, and carrying a loaded firearm, Cal.Penal Code § 12031, *Kennedy*, 667 F.Supp. at 703.

Indeed, as the district court insightfully noted, this case itself underscores the inherent failings of a search policy predicated solely on a felony/misdemeanor classification. The district court described the mechanics leading to Kennedy's search:

> At the time Ms. Kennedy was searched, the jailer had, according to the custom and practice of the jail, a booking slip which informed the jailer that Ms. Kennedy was being charged with grand theft—a crime which in almost all instances does not involve weapons or drugs. Further, the jailer testified that she did not have any suspicion that Ms. Kennedy had drugs or weapons. Ms. Kennedy was compelled nonetheless to undergo the visual body cavity search simply because the policy compelled it. If for example the arresting officer decided that the television set and the other small items had a value of $399 and not $400, the minimum required for grand theft, Ms. Kennedy would not have been subjected to a visual body cavity search.

*Id.* (footnotes omitted). Kennedy's arrest involved an ordinary squabble between two roommates. Unfortunately for Kennedy, the arresting officers, making "an educated guess at best," *id.* at 703 n. 9, valued the missing items in excess of $399, and transmogrified this domestic squabble into an arrest for grand theft, a felony under California law necessitating a body-cavity search.

In short, the LAPD's felony/misdemeanor classification alone indicates little about the likelihood of the arrestee's concealing drugs, weapons, or contraband, the basis for subjecting an arrestee to a visual body-cavity search. On balance, the LAPD's policy cannot withstand the constitutional review articulated in *Wolfish*.

### E

Our conclusion that the City's search policy is unconstitutional under *Wolfish* does not end the analysis. The Court in *Wolfish* delineated the constitutional test for a broad-based policy to search pretrial detainees or convicted inmates that is not premised on individualized suspicion. Accordingly, the possibility remains that the City of Los Angeles had an alternative basis for subjecting Kennedy to a visual body-cavity search.

### I

Preliminarily, the Court's analysis in *Wolfish* requires further reflection. Ordinarily, the propriety of a search under the fourth amendment depends on the particular and individual circumstances surrounding the subject of the search. Those individual circumstances are carefully considered and then tested against an established standard, such as probable cause or reasonable suspicion. The *Wolfish* Court did not follow this customary path; the exigencies of a prison setting demanded a departure. The Court recognized the necessity of according considerable deference to policies enacted to manage these exigencies and sought to strike a balance between the competing needs of the institution and those of the individual. Significantly, this balancing was performed in the abstract; it did not focus on the particular circumstances of the individual searched to determine the constitutionality of the policy as a whole.

This construction of the *Wolfish* analysis follows ineluctably from the Court's disposition of the fourth amendment claims. *Wolfish* involved a class action that challenged, among other things, an institutional policy that mandated visual body-cavity searches of all pretrial detainees after contact visits with outsiders. The Court examined the constitutionality of this policy and rejected the contention that such searches required probable cause. After weighing the security needs of the institution against the privacy costs exacted from the inmates, the Court upheld the broad-based searches. The Court concluded:

> But we deal here with the question whether visual body-cavity inspections as

contemplated by the [institution's] rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can. *Wolfish*, 441 U.S. at 560, 99 S.Ct. at 1885.

This passage is somewhat enigmatic. A possible interpretation is that the Court's balancing was merely prefatory to devising a standard against which to test a particular search. Under this interpretation, the balancing yielded a standard less than probable cause in the *Wolfish* case. The Court's holding, however, cannot sustain this construction. Ultimately, the Court found the searches resulting from this policy—all of them—to be constitutional. *Id.* at 558, 99 S.Ct. at 1884. The Court did not proceed to define a standard short of probable cause, such as reasonable suspicion. The Court did not remand the case for further consideration in light of its balancing approach. Nor did the Court pay momentary attention to the particular facts of each individual search. It is, therefore, conceivable that a member of the class met a visitor for brief seconds, was observed the entire time by a cadre of guards, and yet was searched pursuant to the policy, clearly without individualized suspicion. Nevertheless, this search, assuming it took place, was permissible under *Wolfish;* on balance, such a search was "reasonable." *See* Shuldiner, *supra*, at 285 (noting that the Court did not examine the "justification for conducting these searches arbitrarily and en masse").

The only standard we discern from *Wolfish* in reviewing the constitutionality of an institutional policy is the two-pronged balancing test. Justice Powell's pithy partial dissent in that case lends considerable support to our reading:

> I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case. I therefore dissent on this issue.

*Wolfish*, 441 U.S. at 563, 99 S.Ct. at 1886 (Powell, J., concurring in part, dissenting in part). This passage is revealing: the majority was not formulating a "level of cause" against which the constitutionality of the particular searches were to be tested. That is, the majority was not focusing on the individual basis for each search; the majority's constitutional inquiry instead centered around the soundness of the policy as a whole. *Cf. Rickman v. Avanti*, 854 F.2d 327 (9th Cir.1988) (upholding, under *Wolfish* balancing test, visual body-cavity searches of all segregation unit inmates leaving their cells); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir.1988).

### 2

In *Wolfish*, the Court held the search policy to be constitutional. Our review of the LAPD's policy, in contrast, has led to a different conclusion. Nevertheless, a search, although not supportable under an institutional policy, is not per se unconstitutional. We now must examine the particular circumstances surrounding Kennedy's arrest to determine whether there was reasonable suspicion to conduct a visual body-cavity search.

There is an initial question whether reasonable suspicion is the proper level of cause necessary to justify the search of a felony arrestee. Numerous cases have scrutinized search policies requiring arrestees on minor offenses to undergo a visual body-cavity search. *See, e.g., Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). In *Giles*, the Ninth Circuit tested the constitutionality of a county policy that required all arrestees for minor traffic violations to be subjected to a strip search.[7] *Id.* at 615. The court applied the *Wolfish* balancing test and found the county's policy of strip searching every

---

7. The policy specifically required visual examination of the appellant's body cavities. The appellant, however, was spared this examination, as the officer failed to comply with this requirement. Her examination was confined to a skin search. Although the *Giles* decision did not, therefore, directly involve a visual body-cavity search, the court indicated that its hold-

arrestee unnecessary to protect the institution's security interest. After concluding that the *Wolfish* test could not sustain the search, the court held that "arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband." *Id.* at 617; *see also Ward v. County of San Diego,* 791 F.2d 1329, 1332–33 (9th Cir.1986) (no immunity for public officials who unreasonably subject misdemeanor arrestees to visual body-cavity searches), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986) (striking down blanket body-cavity search policy of arrestees charged with misdemeanors or other minor offenses and requiring particularized reasonable suspicion), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

That this case involves a felony arrest does not alter the level of cause required to justify a visual body-cavity search. Logically, the classification of the offense in some cases might inform the *presence* of suspicion, but it does not inform the *level* of suspicion required. Indeed, the reasonable suspicion standard established in *Giles* prudently invites the consideration of the nature of the crime charged in determining the constitutionality of an individual search. The court emphasized: "Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." 746 F.2d at 617 (citations omitted).[8]

Grand theft, a felony, thus properly could be considered in deciding whether to search Kennedy. And in some cases, the charge itself may give rise to reasonable suspicion. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir. 1989) (The felony of grand theft auto "is sufficiently associated with violence to justify a visual strip search.") (footnote omitted); *Dufrin v. Spreen,* 712 F.2d 1084, 1089 (6th Cir.1983);[9] *Watt,* 849 F.2d at 197–98 ("Reasonableness under the fourth amendment must afford police the right to strip search arrestees whose offenses posed the very threat of violence by weapons or contraband drugs that they must curtail in prisons."). This is certainly not such a case. The grand theft charge here centered around an ordinary disagreement between two roommates. No weapons, no drugs, no contraband, no violent acts of any kind were involved. Nor were there any other circumstances that provided reasonable suspicion to believe that Kennedy concealed contraband. The City does not contend otherwise.

**F**

In conclusion, the district court did not err in giving a reasonable suspicion instruction. The search of Kennedy could not be justified by the LAPD's policy that subjects all felony arrestees to visual body-cavity searches. Consequently, the search's constitutionality hinged upon whether the officials had reasonable suspicion that Kennedy was concealing contraband. The jury reasonably determined that they did not.

---

ing logically would engulf the more intrusive search. 746 F.2d at 616 n. 2.

**8.** It is worth noting that, were we to depart from a reasonable suspicion standard for this part of the analysis, we would be required to construct a new level of cause. Reasonable suspicion, the standard for minor offenses, is the least protective constitutional standard. Because a felony denotes a more serious criminal classification, we would be forced to design a standard lower than reasonable suspicion. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 540–41, 105 S.Ct. 3304, 3310–11, 87 L.Ed.2d 381 (1985) (rejecting "clear indication" as a "third verbal standard in addition to 'reasonable suspicion'

and 'probable cause'" and noting that "subtle verbal gradations may obscure rather than elucidate the meaning of the provision in question").

**9.** In *Dufrin,* appellee was subjected to a visual body-cavity search. The appellant had a policy requiring such searches of all female prisoners to be incarcerated in the Oakland County jail, irrespective of the nature of the crime or the probability that contraband has been concealed. 712 F.2d at 1085. The Sixth Circuit upheld the constitutionality of the search, relying heavily on the fact that the appellee was arrested on felonious assault, a violent felony. *Id.* at 1087, 1088, 1089.

## VII

Appellants next claim the district court erred in awarding attorney's fees because the court based its determination of the amount on hearsay: a computer printout of the time records kept by Kennedy's counsel. Appellants do not contest Kennedy's entitlement to fees under 42 U.S.C. § 1988; they concede that she was the prevailing party below.

If the district court indeed relied upon an improper basis in determining the amount of attorney's fees, such as hearsay, it abused its discretion. *Cf. SEC v. Carter Hawley Hale Stores*, 760 F.2d 945, 947 (9th Cir.1985) (court abuses its discretion if it relies on clearly erroneous facts or misapplies the law). We must therefore determine whether the district court improperly admitted into evidence Kennedy's attorneys' time records. We review for an abuse of discretion the admission of evidence. *Gauthier v. AMF, Inc.*, 788 F.2d 634, 635 (9th Cir.), *modified*, 805 F.2d 337 (1986).

■ A hearsay statement is admissible as a business record under Fed.R.Evid. 803(6) if the following foundational facts are shown by testimony of the custodian or another qualified witness: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded; (2) the record is kept in the course of a regularly conducted business activity. *See United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir.1983); *see also United States v. Linn*, 880 F.2d 209, 216 (9th Cir.1989); *United States v. Catabran*, 836 F.2d 453, 457 (9th Cir.1988). However, the record is not admissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *See Ordonez*, 737 F.2d at 805.

■ One of the attorneys who worked on the case stated in affidavits that she entered information from her husband's handwritten time records into the computer that generated the printout presented to the district court. She swore that the time records were maintained during the course of her firm's representation of Kennedy. She further swore that she and her husband reviewed the records before his death and determined that they were accurate. These statements laid a proper foundation for admission of the time records. Appellants do not persuasively argue that there are indications of untrustworthiness. *See United States v. Licavoli*, 604 F.2d 613, 622–23 (9th Cir.) (district courts have broad discretion regarding determination of trustworthiness), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1979). The district court did not abuse its discretion by admitting this evidence.

## VIII

The decision below is affirmed, and Kennedy's request for attorneys' fees on appeal under 42 U.S.C. § 1988 is granted, *see Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988).