905 F.2d 1540
 Unpublished Disposition
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 
 Garfield GILMORE, Joan Gilmore, James Corbett, Lynn Corbett,
Audrey Gilmore, Irene Corbett, Tom Redfern, Danny
Gahn, Plaintiffs-Appellants,
v.
William O'BRIEN, Arthur Clifford, Kirkland Police Chief,
City of Kirkland, King County, Defendants-Appellees.
 No. 88-4176.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 1, 1989.
Decided June 21, 1990.
As Amended on Denial of Rehearing and Rehearing En Banc
Sept. 12, 1990.
 Before BROWNING, SCHROEDER, and FLETCHER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants filed an action under 42 U.S.C. Sec. 1983 alleging appellees arrested them, or caused them to be arrested, without probable cause in violation of their rights under the fourth and fourteenth amendments. The district court granted the summary judgment motion of appellees and denied that of appellants. We affirm in part and reverse in part.
 
 
 3
 * We review a grant or denial of summary judgment de novo, viewing the facts in the light most favorable to appellants. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 4
 Garfield Gilmore bought a yacht from Peter Bennison and attempted to charter the vessel. This venture proved unsuccessful. Unable to meet the terms of the purchase contract for the yacht, Gilmore filed for bankruptcy. The bankruptcy court eventually ordered Gilmore to return the yacht to Bennison, which he did without protest.
 
 
 5
 Gilmore alleges he subsequently came to believe he had been defrauded by Bennison and could seize the yacht, pursuant to a "legal" procedure called "distress infinite," to secure his rights and prevent the yacht from leaving the jurisdiction pending judicial resolution of the dispute. Gilmore served notices of "distress infinite" on various federal and local authorities and on persons in possession of the vessel. With the assistance of at least James Corbett and Danny Gahn,[1] he seized the yacht and moved it to the Moss Bay Marina, a moorage secured by a locked gate. En route to Moss Bay, the King County Patrol radioed the yacht. Gilmore advised the patrol of his destination and claim of possessory right to the vessel. He stated he intended to keep the vessel at the Moss Bay moorage until a court determined who was entitled to possession.
 
 
 6
 Bennison contacted Detective O'Brien of the Kirkland City Police in an attempt to reacquire his yacht. He informed O'Brien the men in possession of the yacht were armed, had taken the yacht at gunpoint and had threatened to shoot a man attempting to board the yacht.[2] O'Brien went to the moorage, where he met Gahn and David Annino at the locked gate. They refused him entry to the pier and advised him of Gilmore's claim of right and of the "distress infinite" papers.
 
 
 7
 Contacting the U.S. Marshal's office and U.S. Attorney's office, among others, O'Brien learned the "distress infinite" papers had been served but the U.S. Attorney's office considered them to be of no legal effect. Both agencies informed O'Brien they considered the matter a civil dispute. O'Brien then contacted Kirkland City Attorney Ralph Thomas, who also advised him the matter was civil. O'Brien admits he too considered the matter civil at this point, and he so advised Bennison, Bennison's attorney, the mayor of Kirkland and Police Chief Clifford.
 
 
 8
 O'Brien advised Bennison to obtain a contempt order from the bankruptcy court and to file a theft complaint in Seattle, where the yacht was seized. Bennison filed the theft complaint, but instead of obtaining a contempt order, provided O'Brien with a copy of the original bankruptcy order awarding possession to Bennison. O'Brien returned to the Moss Bay moorage and presented the copy of the order to Gahn and Annino. They again advised him of Gilmore's claim and refused to relinquish possession of the vessel.[3]
 
 
 9
 O'Brien then contacted Mike DiJulio of the King County Prosecutor's Office. O'Brien and DiJulio disagree as to what was said in this conversation. O'Brien states he informed DiJulio of the relevant facts and DiJulio advised him there was probable cause to arrest everyone on board the yacht. DiJulio says he does not recall the specifics of the conversation, but denies he told O'Brien he could arrest everyone on the yacht and doubts he would have told O'Brien there was probable cause to arrest anyone. O'Brien then contacted Chief Clifford who authorized the arrest of everyone on the yacht.
 
 
 10
 O'Brien returned to the yacht to arrest everyone aboard for possession of stolen property. Meanwhile, Gilmore had invited guests to board the yacht. When O'Brien arrived with other officers to make the arrests, members of the news media were gathered outside the pier gate and confusion reigned. Annino and Gahn again refused to allow O'Brien to enter. O'Brien instructed another officer to cut the lock from the gate. The officers then arrested everyone at the pier who was on or near the yacht.[4]
 
 
 11
 Appellants later brought this action alleging their fourth and fourteenth amendment rights were violated by the arrests without probable cause. The district court denied summary judgment for appellants and granted summary judgment for appellees, finding as a matter of law there was probable cause for the arrests.
 
 II
 
 12
 Probable cause to arrest without a warrant exists if the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense. Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). In a section 1983 action, "the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury, and summary judgment is appropriate only if no reasonable jury could find the officers did or did not have probable cause to arrest." McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir.1984) (citations omitted).
 
 
 13
 A rational jury could find the facts known to O'Brien and Clifford did not constitute probable cause to arrest the appellants. They were arrested for possession of stolen property. In the State of Washington, possession of stolen property is not a strict liability offense. It requires proof of knowledge of facts sufficient to give notice the property was stolen. State v. Rockett, 493 P.2d 321, 323 (Wash.App.1972). Although probable cause does not require specific evidence of every element of an offense, United States v. Thornton, 710 F.2d 513, 515 (9th Cir.1983), when the police have specific evidence negating an element essential to the offense, they cannot ignore this evidence in making a probable cause determination. Detective O'Brien and Chief Clifford had been informed by legal advisors the dispute between Gilmore and Bennison was civil in nature, they were aware of the "distress infinite" papers and they knew appellants made no attempt to conceal either their identities or the location of the yacht. Counsel for appellees admitted at oral argument appellants "thought they had a right to reclaim the boat."
 
 
 14
 Chief Clifford virtually conceded in his deposition that probable cause did not exist as to everyone on the yacht. He said that, prior to their arrest, he had no facts indicating the Corbetts, the Chomjaks, Annino, or Audrey and Joan Gilmore were involved in a crime. He admitted he authorized the arrests of everyone on the yacht without knowing who was on the yacht or what part, if any, they had played in its seizure.
 
 
 15
 O'Brien testified in a similar vein. He stated he did not know how many people were on the yacht, other than Garfield and Joan Gilmore, Annino and Gahn, and he did not know what part the others played in the seizure of the yacht or what knowledge they had about the seizure.
 
 
 16
 Summary judgment for appellees cannot be sustained on the ground there was probable cause as a matter of law.
 
 III
 
 17
 * O'Brien and Clifford are entitled to qualified immunity if "they can prove that a reasonable [officer in their position] could have believed that the action taken was lawful, in light of clearly established law." Schlegel v. Bebout, 841 F.2d 937, 945 (9th Cir.1988).[5] This question is for the trier of fact, unless there is only one reasonable conclusion a jury could reach. Kennedy v. Los Angeles Police Dep't, 887 F.2d 920, 924 (9th Cir.1989).
 
 
 18
 Viewing the facts in the light most favorable to appellants, we must assume for this appeal Gilmore's claim of right was made in good faith and O'Brien and Clifford had no reason to believe otherwise. Applying the test for probable cause to the facts within the officers' knowledge, including the strong probability that Gilmore had no criminal intent and the officers' own admissions probable cause was lacking as to many of the appellants, we believe a jury could reach more than one conclusion as to whether a reasonable officer in O'Brien and Clifford's position could have believed the arrests "to be lawful, in light of clearly established law and the information the [arresting] officers possessed." Id. (quotation omitted). The issue of qualified immunity is for a trier of fact.
 
 
 19
 We reverse summary judgment in favor of O'Brien and Clifford.
 
 B
 
 20
 Appellants maintain King County is liable to them under 42 U.S.C. Sec. 1983 because DiJulio was a policy maker for the county. In City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) (plurality opinion), the Supreme Court identified four guiding principles for determining whether a decision on a single occasion establishes municipal policy exposing the municipality to liability for the actions of its agents carrying out that policy. First, a municipality may be liable only for " 'acts which the municipality has officially sanctioned or ordered.' " Id. at 123 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)). Second, an official must have "final policymaking authority" in order to subject the municipality to liability. Id. Third, whether the official has such final authority is a question of state law. Id. Fourth, the official must have been "responsible under state law for making policy in that area of the city's business," id.; that is, if the policy were lawful, the official would have been acting within the scope of the official's authority.
 
 
 21
 Although DiJulio, as a King County deputy prosecutor, had authority to give advice to local police, he had no authority to order the Kirkland Police to do anything. The record reveals no genuine issue of material fact relevant to this issue.
 
 
 22
 We affirm summary judgment in favor of King County.
 
 C
 
 23
 Appellants also contend the City of Kirkland is liable, on the grounds "that the Chief of Police for the City of Kirkland is the authorized municipal policy maker." But the facts of this case do not support the conclusion Chief Clifford was acting as an authorized policy maker.
 
 
 24
 We affirm summary judgment in favor of the City of Kirkland.
 
 IV
 
 25
 We AFFIRM summary judgment for King County and the City of Kirkland. We REVERSE summary judgment for O'Brien and Clifford. This case is REMANDED for further proceedings consistent with this disposition.[6]
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The deckhand on the yacht when it was taken stated the yacht was seized by Gilmore and five or six long-haired men in their twenties
 
 
 [2]
 Subsequently, but before deciding to make the arrests, O'Brien learned that Bennison's representatives had made their own threats and apparently intended to retake the yacht by force
 
 
 [3]
 The police observed some of the appellants displaying weapons while they were in possession of the yacht
 
 
 [4]
 It is virtually impossible from the briefs and record to determine how many people were arrested and who they were. Although the Kirkland defendants' brief and an arrest report in the record indicate ten people were arrested, our review indicates twelve people were on or near the yacht and the record indicates everyone present was arrested. This count assumes Lynn and Linda Corbett are actually the same person and that both James Corbett, Sr. and Jr. were arrested. Although the depositions and affidavits state that Audrey Gilmore was arrested, neither her name nor the name of Mrs. Chomjak appears on the arrest report
 
 
 [5]
 Qualified immunity is an affirmative defense, and the burden of proving that defense lies with the party asserting it. Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir.1989)
 
 
 [6]
 Each party is to bear its own costs on appeal